IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 1:05-cr-00448-EWN-01

UNITED STATES OF AMERICA,

Plaintiff,

*Draft 3-24-2006*

v.

1. MOISES RODRIGUEZ,
   a/k/a Moises Rodriguez-Tena,

   Defendant.

# PLEA AGREEMENT AND STATEMENT OF FACTS
# RELEVANT TO SENTENCING

The United States of America (the government), by and through Gregory A. Holloway, Assistant United States Attorney for the District of Colorado, and the Defendant, MOISES RODRIGUEZ, a/k/a Moises Rodriguez-Tena, personally and by counsel, Daniel F. Boyle, submit the following Plea Agreement and Statement of Facts Relevant to Sentencing.

## I. PLEA AGREEMENT

The Defendant agrees to plead guilty to Count 1 of the Indictment charging a violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (v)(II) and (B)(i) – Transporting Illegal Aliens and Aiding and Abetting the Same. The Defendant also agrees to plead guilty to Count 2 of the Indictment charging a violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), (v)(II) and (B)(i) – Harboring Illegal Aliens and Aiding and Abetting the Same. The Defendant agrees to confess any and all property interest for the following items listed in Count 5 (Forfeiture

Court Exhibit 1

Allegation): (1) A 9.14 acre parcel including apartment buildings, trailer and outbuildings located at 22185 Highway 52, Hudson, Colorado; (2) $128,413.00 in U.S. currency; and (3) Valley Trust Bank; Hudson, Colorado; Account Number 124 101 428 in the names of Moises and Maria Rodriguez.

The government agrees not to charge the defendant in the Federal District of Colorado with any additional criminal activity now known to the government. At the time of sentencing, the government agrees to dismiss the remaining Counts of the Indictment and the remaining items in the Count 5 (Forfeiture Allegation) as they relate to this defendant only. The government also agrees that a two (2) point reduction in the offense level for acceptance of responsibility is appropriate. This plea is pursuant to Fed. R. Crim. P. 11(c)(1)(B).

As part of this disposition, the defendant agrees to debrief truthfully with ~~Alcohol, Tobacco and Firearms~~ BICE ("ATF") agents and other law enforcement officials concerning his knowledge of other individuals involved in alien smuggling (including harboring, transporting and inducing illegal aliens,) employment of illegal aliens, drug trafficking, violent criminal activities, and/or dealings with firearms in the District of Colorado and elsewhere. The United States agrees to fairly consider the information provided pursuant to §5K of the Sentencing Guidelines and Policy Statements. The United States, in its sole discretion, will determine whether the defendant has provided substantial assistance. The defendant also agrees to testify truthfully before a grand jury or petit jury in this case and any future prosecution against any co-defendants and any potential co-defendants arising out of his debriefing.

If the defendant provides substantial assistance in the debriefing described above, by fully and truthfully disclosing all information known to ~~her~~ him concerning the matters referenced above, the

government will file a motion for downward departure pursuant to §5K1.1 of the Sentencing Guidelines.

The defendant agrees and consents that facts that determine the offense level will be found by the Court, by a preponderance of the evidence, and that the Court may consider and use any reliable evidence, including hearsay and the facts outlined in the Presentence Report. The parties further agree that the stipulation of facts in this plea agreement will also be used by the Court in determining the Guideline range. The parties understand that the Guidelines are advisory pursuant to *United States v. Booker*, 125 S.Ct. 738 (2005). The Court is required to consider the Guidelines ranges, but is permitted to tailor the sentence in light of other statutory concerns as well. *Id*.

Defendant understands and acknowledges, however, that these recommendations are not binding on the Court, that sentencing is in the sole discretion of the Court, and that the Court may sentence the defendant up to the statutory maximum regardless of the parties' recommendations.

## II. **STATUTORY PENALTIES**

The statutory penalty for Counts 1 and 2 of the Indictment charging violations of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (v)(II) and (B)(i) – Transporting Illegal Aliens and Aiding and Abetting the Same; and, 8 U.S.C. §§ 1324(a)(1)(A)(iii), (v)(II) and (B)(i) – Harboring Illegal Aliens and Aiding and Abetting the Same, for each count are: not more than ten (10) years imprisonment; not more than a $250,000 fine, or both; not more than three (3) years supervised release; and $100 special assessment fee.

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury. If the defendant is an

alien, the conviction may cause the defendant to be deported or confined indefinitely if there is no country to which the defendant may be deported.

A violation of the conditions of probation or supervised release may result in a separate prison sentence.

### III. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements which establish a factual basis of the offense of conviction.

Pertinent facts are set out below in order to provide a factual basis of the plea and to provide facts which the parties believe are relevant, pursuant to §1B1.3, for computing the appropriate guideline range. To the extent the parties disagree about the facts relevant to sentencing, the statement of facts identifies which facts are known to be in dispute at the time of the plea. (§6B1.4(b))

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein which are relevant to the guideline computation (§1B1.3) or to sentencing in general (§1B1.4). In "determining the factual basis for the sentence, the Court will consider the stipulation of the parties, together with the results of the presentence investigation, and any other relevant information." (§6B1.4 Comm.)

The parties agree that the government's evidence would show that the date on which conduct relevant to the offense (§1B1.3) began is approximately October 1, 2004, and the activity occurred in the State and District of Colorado and elsewhere.

The parties agree that the government's evidence would be:

4

On or about October 1, 2004 agents from the Bureau of Immigration and Customs Enforcement ("ICE") began an investigation into an illegal labor camp being run out of some barracks in Hudson, Colorado. A local immigration attorney had contacted law enforcement about this operation and indicated that numerous aliens that had been illegally smuggled into the United States were being housed in barracks on a 9.14 acre parcel located at 22185 Highway 52, Hudson, Colorado. The attorney explained that the operation was being run by defendant Moises Rodriguez, his wife, co-defendant Maria Rodriguez, and his son, co-defendant Javier Rodriguez. ICE agents interviewed seven subjects – all of whom were illegal aliens. The aliens explained that they had contacted Moises Rodriguez through people in Mexico about being smuggled into the United States. The aliens were told to contact a man near the Mexican-United States border who would arrange for them to illegally cross into the United States. Each alien explained how they crossed the border on foot with smugglers (known as coyotes,) walking for days in the desert until they reached a hardball road in Arizona. The illegal aliens told agents that the defendant then arrived in a white pickup after the coyotes made cell phone calls. The defendant drove the illegal aliens to a house in Phoenix, Arizona where they waited for about two days. Then, the defendant and his son, Javier Rodriguez, drove the illegal aliens from Phoenix, Arizona to Hudson, Colorado. Once in Hudson, the illegal aliens worked for the defendant and his wife at various local farms.

The illegal aliens lived at the 9.14 acre parcel located at 22185 Highway 52 in old barracks style apartments provided to them by the defendant. Javier Rodriguez and co-defendant Ignacio German Juarez (who is an illegal alien himself) lived on the 9.14 acres with the illegal aliens. Both Javier Rodriguez and Ignacio German Juarez were foremen – overseeing the illegal aliens as they

worked in the fields and lived at the barracks. The illegal aliens explained that the defendant and his wife charged them a "smuggling fee," typically about $1,100 to $1,300, that was taken out of their pay until the entire amount was paid in full. The illegal aliens provided agents with various pay statements, checks, and wage and hour statements. The checks were signed by Maria Rodriguez. The statements listed both Maria Rodriguez and the defendant as the employer, with the business address listed as 657 Birch Street, Hudson, Colorado. Additionally, the statements showed various deductions – including deductions for social security, even though none of the illegal aliens that the defendants provided statements to had valid social security numbers.

Through investigation, agents learned that the defendant owned a white Dodge Pickup as described by the illegal aliens. Agents learned that the 9.14 acre parcel was owned by the defendant & his wife, and the actual barracks were owned by Javier Rodriguez. Javier Rodriguez lived in a trailer next to the barracks on the 9.14 acres. Agents surveilled the operation. They watched as the defendant would go to the barracks at the start of the day and contact either Javier Rodriguez or Ignacio German Juarez. The aliens would be loaded onto a bus or into a panel van driven by Juarez, and taken to work in various fields. A check of the Rodriguez's labor and employment records indicated that they did not have any employees on record; and, reported no wages. The defendants were not validly registered to transport, house or drive any seasonal migrant workers. The defendants business address is listed as the same as their residence, at 657 Birch Street, Hudson, Colorado.

In the spring of 2005, a confidential informant ("CI") contacted the defendant. The defendant told the CI that he wanted workers who were not lazy and willing to work hard. On June 9, 2005, after a number of previous calls, the CI met the defendant at the defendant's house. The defendant led the CI to the 9.14 acres and barracks to show the CI the operation. The defendant explained to

the CI that Javier Rodriguez was in charge of the "crew" and that they had a foreman, Ignacio German Juarez. The defendant said his wife, Maria Rodriguez, handled all of the payroll and books. The defendant explained that he operates as an independent contractor for area farms. He said he pays his workers every two weeks, and that they work 12 hours a day, 7 days a week.

The defendant told the CI that he mostly uses workers from Puebla, Mexico. The defendant explained that he uses a "coyote" from Toluca, Mexico. He said that he was waiting for 15 workers. The defendant stated that the workers were being smuggled in from Palomas, Mexico to Phoenix, Arizona. The defendant said he was going to drive to Phoenix to pick them up or send someone else down and get them. The defendant said he will pay the coyote in Phoenix, and that he knew the people he was hiring and bringing to Hudson were illegally in the United States. This conversation was audio and video taped.

Later, on August 1, 2005, the CI spoke with the defendant in a recorded phone call. The defendant said he had successfully picked up the 15 illegal workers in Phoenix and arrived in Hudson, Colorado. The defendant went on to tell the CI about how he tells aliens to go to Palomas, Mexico and find a specific room at the hotel "San Carlos." Once at the hotel, aliens are told to ask for a man named "Gerardo" and tell him they are with Moises Rodriguez. Gerardo then smuggles them from Mexico to Phoenix, Arizona – charging Moises Rodriguez $800 to get the illegal aliens to Phoenix, and $550 - $600 to get them just across the border. The defendant explained that Gerardo will call him once he has the aliens in Phoenix and arranges a place for the defendant to pick them up. The defendant told the CI he had no plans to bring more workers in as the season was ending soon, and that he charges about $1,300 to get illegal alien workers to Colorado from Mexico.

Simultaneously, agents continued their surveillance throughout the spring, summer and fall of

2005. As before, agents watched the defendant, Javier Rodriguez and Ignacio German Juarez oversee illegal aliens living at the barracks, loading them onto various vehicles (busses and vans registered to both Moises and Maria Rodriguez) to transport them, and supervising them working in fields throughout Northern Colorado.

Agents obtained search warrants for the 9.14 acre parcel including apartment buildings, trailer and outbuildings located at 22185 Highway 52, Hudson, Colorado and the residence (and business) of the defendant at 657 Birch Street, Hudson, Colorado. Indictments were also obtained. Agents executed the warrants on October 18, 2005 right after the defendant went to the barracks, woke up the illegal alien workers, and boarded them onto a bus. The defendant was arrested driving away from the barracks in his white truck. When agents stopped the bus, which was being driven by Ignacio German Juarez, they found 17 illegal aliens. Ignacio German Juarez had a written roster of the illegal aliens on the bus along with rosters for various other dates. There was also a video camera on the bus. The tape found inside the camera showed the illegal aliens working in fields, with Javier Rodriguez and Ignacio German Juarez supervising them.

Inside the defendant's white truck, the defendant had an open briefcase with him. Inside the defendant's briefcase was another roster of the illegal aliens on the bus with dates and times. There were also pay statements and other records.

In a search of the barracks, agents found pesos, Mexican identification documents, food, clothing and other items showing that people were living there. At the Birch Street residence, agents found an office area with extensive records of the smuggling operation. Included were thousands of pages of records such as pay statements for illegal aliens, checks (from both Valley Trust Bank; Hudson, Colorado; Account Number 124 101 428; and, Wells Fargo Bank, Brighton, Colorado;

Account Number 102 0000 76) made out to illegal aliens signed by Maria Rodriguez, and other ledgers showing payments for "coyotes," "Javier," "gas," and "hotel." Also found were multiple payments and documents related to Ignacio German Juarez.

## IV. SENTENCING COMPUTATION

The parties understand that in sentencing the defendant, this court will consider the sentencing guidelines, issued pursuant to 28 U.S.C. § 994(a) as well as the factors set forth in 18 U.S.C. §3553(a).

Any estimation by the parties regarding the estimated appropriate guideline application does not preclude either party from asking the Court to depart from the otherwise appropriate guideline range at sentencing, if that party believes that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the sentencing guidelines. (§5K2.0)

The parties understand that the Court may impose any sentence, up to the statutory maximum, regardless of any guideline range computed, and that the Court is not bound by any position of the parties. (§6B1.4(d)) The Court is free, pursuant to §§6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties' stipulations, the presentence investigation, and any other relevant information. (§6B1.4 Comm.; §1B1.4)

To the extent the parties disagree about the sentencing factors, the computations below identify the factors which are in dispute. (§6B1.4(b))

A.  The base guideline for both Counts 1 and 2 pursuant to §2L1.1(a)(2) is 12.

B.  Because the offenses involved between 6 and 24 illegal aliens, §2L1.1(b)(2)(A) applies, adding 3 levels.

C.  No victim-related, and/or obstruction adjustments apply. Pursuant to §3D1.1, there is no increase in offense level.

D.  The adjusted offense level would therefore be 15.

E.  The defendant should receive a two (2) point adjustment for acceptance of responsibility. The resulting offense level would therefore be 13.

F.  The parties understand that the defendant's criminal history computation ("CHC") is tentative. The criminal history category is determined by the Court. Known facts regarding the criminal history are as follows:

The parties believe the defendant's criminal history category is I.

Based on that information, if no other information were discovered, the defendant's criminal history category would be I.

G.  As noted above, assuming the (tentative) criminal history facts of (F) above, the armed career criminal adjustments do not apply.

H.  The guideline range resulting from the estimated offense level of (E) above, the (tentative) criminal history category of (F) above is from 12 to 18 months. The defendant understands that the possible range given a score of 13 is from 12 (bottom of CHC I) to 41 (top of CHC VI) months.

I.  Pursuant to guideline §5E1.2, assuming the estimated offense level of (E) above, the fine range would be $3,000 to $30,000, plus applicable interest and penalties.

J.  Pursuant to guideline §5D1.2, if the Court imposes the term of supervised

release, that term shall not be more than three (3) years.

## V. WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE

The parties believe the sentencing range resulting from the proposed plea agreement is appropriate because all relevant conduct is disclosed, the sentencing guidelines take into account all pertinent sentencing factors with respect to this defendant, and the charges to which the defendant has agreed to plead guilty adequately reflect the seriousness of the actual offense behavior.

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 5-12-06

Moises Rodriguez
Defendant

Date: 5-12-06

Daniel F. Boyle
Attorney for Defendant

Date: 5/18/06

Gregory A. Holloway, WSBA #28743
Assistant U.S. Attorney